**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. _____

JENNIFER THELUSMA,

     Plaintiff,

v.

NEWREZ LLC d/b/a SHELLPOINT
MORTGAGE SERVICING,

     Defendant.

_____/

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Jennifer Thelusma sues Defendant Newrez LLC d/b/a Shellpoint Mortgage Servicing for violations of (1) the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601 *et seq.* ("RESPA"), and Regulation X, 12 C.F.R. § 1024 *et seq.*; and (2) the Florida Consumer Collection Practices Act, Fla. Stat. § 559.55 *et seq.* ("FCCPA").

**JURISDICTION AND VENUE**

1. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff's claims arise under RESPA and Regulation X.

2. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's FCCPA claim, which arises from the same case or controversy as her federal claims.

3. Venue is proper under 28 U.S.C. § 1391(b) because the property at issue is located in this District and a substantial part of the events giving rise to Plaintiff's claims occurred here.

1

**PARTIES**

4.      Plaintiff Jennifer Thelusma is a natural person who resides in Miami-Dade County, Florida, and owns the condominium unit at 20379 W Country Club Drive, Unit 836, Aventura, Florida (the "Property").

5.      Defendant Newrez LLC d/b/a Shellpoint Mortgage Servicing is a foreign limited liability company with a principal place of business at 1100 Virginia Drive, Fort Washington, Pennsylvania.

**FACTUAL ALLEGATIONS**

6.      Plaintiff purchased the Property in February 2023.

7.      It is an eighth-floor unit in a three-building high-rise complex.

8.      A mortgage loan (the "Loan") encumbers the Property.

9.      The Property sits in a Special Flood Hazard Area, and the Loan requires that flood coverage be maintained.

10.     Because the Property is a unit in a high-rise, the complex's master flood insurance policy satisfies that requirement.

11.     The master policy provides blanket coverage for the entire building, including Plaintiff's unit.

12.     Plaintiff does not maintain a separate individual flood policy.

13.     When Plaintiff's prior servicer requested proof of the master policy in October 2023, Plaintiff provided it, and the servicer imposed no lender-placed insurance.

**Defendant Took Over Servicing and Force-Placed Flood Insurance.**

14.     In the summer of 2024, Defendant assumed servicing of the Loan.

15.     The Loan was current when Defendant assumed servicing, and Plaintiff's monthly payment was $1,987.13.

16.     On October 1, 2024, Defendant sent Plaintiff a flood insurance notice. The notice told Plaintiff to send a copy of the master coverage but buried the electronic submission link in small print at the bottom of the page.

17.     On November 18, 2024, Defendant force-placed a flood insurance policy on the Loan with an effective date of October 1, 2024, and began drawing the premiums from Plaintiff's escrow account.

18.     In November 2024, Plaintiff located the buried link, visited the portal, and uploaded the master flood policy declaration page that included the policy number and the identity of, and contact information for, the insurance company.

19.     Defendant received the documentation but did not cancel the policy or refund the force-placed charges.

**The Force-Placed Charges Caused or Increased the Escrow Shortage and Monthly Payment.**

20.     On January 14, 2025, Defendant ran an escrow analysis.

21.     By its own figures, the escrow account had fallen to negative $4,039.33, with a calculated escrow shortage of $5,741.54, due to the force-placed flood charges.

22.     Defendant spread that shortage over sixty months and raised Plaintiff's monthly payment from $1,987.13 to $2,637.49, effective March 1, 2025.

23.     The resulting shortage and payment increase were therefore overstated by the amount attributable to the unnecessary policy.

24. Without that error, the escrow shortage and monthly payment would have been lower, in amounts shown by Defendant's own transaction history and a corrected escrow analysis.

**Plaintiff Disputed the Charges and Force-Placed Policy in Writing.**

25. On or about February 14, 2025, Plaintiff sent a written notice of error ("NOE 1") to Defendant's designated address for notices of error.

26. NOE 1 identified Plaintiff as the borrower and provided her mortgage loan number.

27. In NOE 1, Plaintiff disputed the increase in her monthly payment from $1,987.13 to $2,637.49 and identified the force-placed flood insurance as the source of the error. She explained that the Property is a unit in a high-rise, that the building's master policy insures the entire structure against flood, and that Plaintiff is not responsible for separately insuring the unit.

28. Plaintiff told Defendant that she had already provided proof of the master coverage through the link in Defendant's own letter, and that Defendant had nonetheless never acknowledged the proof, never cancelled the policy, never refunded the premiums, and continued to draw flood charges from her escrow account.

29. Plaintiff told Defendant that the flood charges lacked a reasonable basis, that they had left her escrow account overdrawn, and that the resulting payment increase was erroneous.

30. She demanded that Defendant review and correct the errors.

31.     Defendant received NOE 1 on or about February 19, 2025, and acknowledged the dispute on February 24, 2025, but failed to respond to or correct the errors within the time required by RESPA and Regulation X.

32.     By the expiration of Defendant's response period for NOE 1, Defendant had not yet sent the August 25, 2025, default notice, assessed the later foreclosure-related charges, accelerated the Loan, or placed the second flood policy.

33.     Had Defendant timely conducted the same review that led it on August 6, 2025, to cancel the first policy to inception and confirm no lapse, it would have removed the force-placed charges, credited the escrow account, and issued a corrected accounting before those later consequences occurred.

34.     On March 1, 2025, Plaintiff paid $1,987.13, the monthly amount due before Defendant's disputed escrow increase, and Defendant withdrew those funds from her bank account.

35.     On or about March 18, 2025, Defendant sent a letter treating the March installment as unpaid or deficient and threatening an $89.20 late charge and adverse credit reporting.

36.     On or about April 1, 2025, Plaintiff mailed Defendant a second written notice of error ("NOE 2"), responding to Defendant's March 2025 letter.

37.     Plaintiff mailed NOE 2 to Defendant's designated address.

38.     NOE 2 identified Plaintiff as the borrower and provided her mortgage loan number.

39.     NOE 2 disputed Defendant's treatment of the $1,987.13 March 1 payment and identified the payment date, amount, and Defendant's withdrawal of the funds.

40. NOE 2 further disputed any failure to credit or properly apply those funds and any late charge or delinquency status based on Defendant's treatment of the disputed $650.36 escrow differential.

41. In NOE 2, Plaintiff disputed the resulting $89.20 late fee and Defendant's stated intent to report the account to the credit agencies as past due, and she asked Defendant to stop reporting the disputed amounts as past due while the errors in NOE 1 remained unresolved.

42. Plaintiff asked Defendant to stop demanding the erroneously increased payment and to provide a timeline for resolving the errors already identified.

43. On or about April 10, 2025, Defendant acknowledged receiving NOE 2.

44. But again, Defendant failed to respond to or correct the errors identified in NOEs 1 and 2 within the time required by RESPA and Regulation X.

**45.** On June 14, 2025, Plaintiff mailed a third written notice of error ("NOE 3") to Defendant's designated address.

**46.** In NOE 3, Plaintiff recounted that the master policy for her building had continuously insured the entire building, including Plaintiff's unit, since February 2023, that Plaintiff had provided proof of that coverage through the link in Defendant's letter, and that Defendant had never acknowledged the proof, cancelled the policy, or refunded the escrow charges.

47. Plaintiff stated that, as of June 14, 2025, Defendant had neither corrected the errors nor issued any determination that no error had occurred, while continuing to send letters declaring the Loan in default on the inflated amounts and threatening foreclosure.

48. Plaintiff demanded that Defendant remove the force-placed flood insurance

and refund the related premiums and fees, recalculate the escrow obligation using the correct tax and hazard figures, correct its credit reporting, and stop placing the Loan in default or initiating foreclosure based on the inflated balance.

49.     On or about June 25, 2025, Defendant acknowledged receiving NOE 3.

50.     Defendant failed to respond to or correct the errors identified in NOE 3 within the time required by RESPA and Regulation X.

**Defendant's Response Came Months Late and Contradicted Itself.**

51.     Defendant did not substantively respond to NOE 1 and NOE 2 until August 5, 2025.

52.     In the August 5 letter, Defendant stated that no error had occurred in the servicing of Plaintiff's Loan.

53.     Defendant stated that it received insurance documents on December 17, 2024, but that the information did not meet the requirements for proof of coverage.

54.     This statement was false in two ways.

55.     First, Plaintiff provided proof of coverage in November 2024.

56.     And second, the proof of coverage Plaintiff submitted included the master flood policy declaration page with the policy number and the identity of, and contact information for, the insurance company. 42 U.S.C. § 4012a(e)(4) ("For purposes of confirming a borrower's existing flood insurance coverage, a lender or servicer for a loan shall accept from the borrower an insurance policy declarations page that includes the existing flood insurance policy number and the identity of, and contact information for, the insurance company or agent.")

7

57.     Defendant further defended the very payment increase its error had produced. It recited that its January 14, 2025, escrow analysis yielded a $5,741.54 shortage and a $2,637.49 monthly payment.

58.     It ignored that Plaintiff had provided sufficient proof of coverage in November 2024, and that the force-placed charges had drained the escrow and were a substantial cause of that shortage.

59.     Defendant admitted that it had reported the account to the credit bureaus as past due and stated that it "will not remove the reported delinquencies," even though the past-due amounts were caused by the improper force-placed flood policy and were the subject of Plaintiff's pending notices of error.

60.     Only the next day, on August 6, 2025, did Defendant cancel the force-placed flood policy, effective October 1, 2024, and confirm there had been no lapse in coverage.

61.     On August 7, 2025, Defendant finally refunded $3,125.77 to the escrow account.

62.     The August 7, 2025, escrow credit did not restore the Loan to the position it would have occupied had Defendant timely corrected the error.

63.     Defendant did not issue a corrected escrow analysis, reduce the payment to the but-for amount, reverse derivative late or collection charges, correct the treatment of Plaintiff's payments, or retract the delinquency information it had furnished.

64.     Consequently, Defendant carried the disputed accounting forward into subsequent monthly statements, the August 25 default notice, the stated reinstatement amount, and its collection activity.

**Defendant Force-Placed Flood Insurance a Second Time.**

65. In late 2025, Defendant force-placed flood insurance on the Loan a second time.

66. Its loan history records a lender-placed flood disbursement of $854.63 on December 5, 2025, and further disbursements of $284.88 on January 8, 2026, and $284.88 on March 9, 2026.

67. Defendant placed the second flood policy after it had already cancelled the first policy to inception, confirmed there was no lapse, and refunded the premiums.

68. In December 2025, Plaintiff again submitted proof of current flood coverage.

69. Defendant did not cancel the second policy, did not refund the three disbursements totaling $1,424.39, and continued to include those charges in the amount it claimed was due.

70. After that second proof of coverage, Defendant retained the second-policy charges and continued to demand them rather than promptly cancel the policy and correct the account.

**Defendant's Uncorrected Accounting Progressed into Default and Foreclosure.**

71. On August 25, 2025, Defendant sent Plaintiff a default notice stating that the owner of the Loan had instructed it to commence foreclosure.

72. Defendant assessed foreclosure-related charges against the account, including a $1,620.00 attorney cost, a $540.00 foreclosure cost, and a $155.00 title cost, totaling $2,315.00.

73. By its March 18, 2026, mortgage statement, Defendant reported that foreclosure had been initiated, demanded a reinstatement amount of $15,281.24, and stated that it had accelerated the balance to $304,058.00.

74. The $15,281.24 reinstatement demand included the second-policy charges and other amounts derived from the disputed escrow and payment accounting.

**Plaintiff Gave Defendant Two More Opportunities to Correct the Errors.**

75. On or about February 14, 2026, Plaintiff mailed a fourth written notice of error ("NOE 4") to Defendant's designated address.

76. NOE 4 identified Plaintiff as the borrower and provided her mortgage loan number.

77. NOE 4 disputed as erroneous Defendant's August 25, 2025 purported resolution of Plaintiff's February 2025 notice of error, the January 2026 escrow account disclosure, the force-placed insurance Defendant continued to levy on the account, and related charges.

78. NOE 4 explained that, although Defendant's August 2025 resolution stated there was no error and that it would remove the insurance, Defendant never adjusted the account balance or the related interest to account for the approximately nine months it had charged Plaintiff for the wrongful coverage, and that her balance continued to inflate as a result.

79. NOE 4 disputed Defendant's second force-placement of insurance in November 2025, reminding Defendant that the condominium association insured the building and that Plaintiff had sent proof of coverage in December 2025, which Defendant had not honored, refunded, or ceased charging.

80. NOE 4 disputed Defendant's stated intent to again increase Plaintiff's monthly payment in March 2026, identifying the inflated interest, the attorney's fees, the anticipated homeowner's-insurance increase, and the wrongful insurance charges as amounts Defendant

lacked a basis to impose, and demanded that Defendant ensure the balance was accurate and remove the wrongful charges before any increase.

81.    Defendant failed to respond to or correct the errors identified in NOE 4 within the time required by RESPA and Regulation X.

82.    On April 14, 2026, through counsel, Plaintiff mailed a fifth written notice of error ("NOE 5") to Defendant's designated address, identifying Plaintiff, her account number, and Defendant's servicing errors.

83.    NOE 5 incorporated Plaintiff's previous NOEs and explained that the errors included those raised in the prior notices and never corrected, new errors arising from Defendant's deficient resolution of those notices, and further errors that had emerged since.

84.    NOE 5 itemized Defendant's errors, including the two wrongful force-placements of flood insurance, the failure to cancel the policies and refund the escrow after Plaintiff submitted proof of coverage, the failure to apply Plaintiff's monthly payments, the imposition of fees and costs without a reasonable basis, the filing of a foreclosure on a default of Defendant's own making, the untimely and inadequate responses to the prior notices, and the furnishing of inaccurate delinquency information to the credit bureaus.

85.    NOE 5 traced each error to Defendant's force-placement of insurance the building's master policy already covered, and Defendant's refusal to cancel and refund it after Plaintiff proved coverage.

86.    NOE 5 demanded that Defendant cancel the second force-placed policy, refund the wrongful charges, reconcile and correct the escrow account, apply Plaintiff's payments, remove the unsupported fees, correct its credit reporting, and dismiss the foreclosure.

87.     Defendant acknowledged the inquiry by letter dated April 22, 2026, and stated that it was gathering information.

88.     As of this Complaint, Defendant has not responded to or corrected the errors identified in NOE 5 as required by RESPA and Regulation X.

**Defendant's Pattern and Practice of the Same Servicing Failures.**

89.     Defendant's mishandling of Plaintiff's Loan was not isolated. On March 31, 2026, the Washington State Department of Financial Institutions issued a Statement of Charges against Defendant, Case No. C-25-3919-26-SC01, charging it with a pattern of the same servicing failures at issue here.

90.     The Statement of Charges alleges that, between about February 14, 2021 and March 28, 2025, Defendant failed to maintain and service escrow accounts for at least seventy-one Washington loans, and that in at least sixty-two of those loans Defendant purchased force-placed insurance for borrowers who already had active insurance policies.

91.     The Statement of Charges also alleges that Defendant disbursed a duplicate force-placed insurance premium, disbursed a premium for a non-escrowed policy, and did not timely cancel a force-placed insurance policy, and characterizes this as a repeated violation from Defendant's prior examinations.

92.     The Statement of Charges alleges that, between about August 4, 2023 and December 19, 2024, Defendant did not properly apply payments on at least nine Washington loans, again a repeated violation from prior examinations.

93.     The Statement of Charges alleges that, between about August 10, 2024 and September 17, 2025, Defendant failed to send the required written response after receiving a

notice of error from at least two Washington borrowers, in apparent violation of 12 C.F.R. § 1024.35(e), and that this too was a repeated violation from prior examinations.

94.     The conduct Washington alleges mirrors Defendant's conduct here, and supports that Defendant's treatment of Plaintiff reflects a pattern or practice of noncompliance rather than an isolated error. Defendant has the right to contest the Washington charges, which remain pending; Plaintiff alleges them as evidence of a pattern or practice and not as adjudicated findings.

**Plaintiff's Damages.**

95.     Defendant's initial force-placement occurred before NOE 1, but NOE 1 triggered a present obligation to investigate and correct the existing servicing error. Defendant's post-NOE failure caused the erroneous charges and their accounting consequences to remain in place.

96.     Defendant's August 6, 2025, cancellation of the first policy to its inception and August 7 refund demonstrate that a timely and reasonable investigation would have discovered the same error and made the same correction by the applicable response deadline.

97.     At that deadline, the later default notice, foreclosure-related charges, acceleration, foreclosure proceeding, and second force-placement had not yet occurred. Those later consequences arose while Defendant left the account uncorrected.

98.     From the applicable response deadline until August 7, 2025, Defendant retained first-policy funds that a timely correction would have returned earlier. Plaintiff lost the use and time value of those funds, and the charges continued to affect the escrow balance and amounts Defendant demanded.

99.    The August refund did not cure the derivative accounting injuries because Defendant left in place the payment amount, delinquency status, late charges, payment-application consequences, and credit reporting generated from the uncorrected account.

100.    Defendant later imposed and has not refunded second-policy charges, which continue to accrue.

101.    Plaintiff identifies the unrefunded second-policy charges as a continuing consequence of Defendant's failure to correct, not of the placement alone. NOE 4 and NOE 5 identified the second policy and its charges as errors, and Defendant's failure to investigate and correct them after those notices left the charges on the account and in the amounts Defendant demanded.

102.    Defendant also assessed at least one $89.20 late charge and foreclosure-related charges totaling at least $2,315.00, none of which would otherwise have been incurred.

103.    The reinstatement and acceleration notices exposed Plaintiff to the risk of losing her home and required her to address a cure demand that included disputed amounts.

104.    Defendant treats these amounts as debt owed under the Loan.

105.    Because Defendant failed to timely and accurately resolve the earlier notices, Plaintiff incurred additional postage and delivery costs for NOE 3, NOE 4, and NOE 5.

106.    Plaintiff wasted substantial time drafting and delivering successive error letters because Defendant failed to timely respond to or correct the errors identified in NOEs 1, 2, 3, and 4.

107.    Each unanswered NOE forced Plaintiff to prepare and serve another, requiring her to re-research the servicing errors, identify new errors, re-compile and re-transmit her

proof of insurance, payment records, and correspondence, draft a further written notice of error, and arrange and pay for its delivery.

108. Had Defendant timely investigated and corrected the errors in response to the earlier notices, Plaintiff would not have had to draft, assemble, and deliver each subsequent NOE, and the hours she devoted to that repeated effort are a direct and foreseeable consequence of Defendant's failure to respond.

109. Defendant furnished delinquency and default information to consumer reporting agencies after Plaintiff disputed the accounting and later refused to remove the reported delinquencies.

110. That furnishing impaired Plaintiff's credit standing by lowering her credit score and damaged her reputation.

111. Defendant's prolonged failure to respond, refusal to correct the account after repeated proof, continued delinquency reporting, and escalating default and foreclosure demands caused Plaintiff emotional distress distinct from ordinary frustration with the initial insurance dispute.

112. Plaintiff suffered fear of losing her home, including persistent worry that she and her household would be displaced from the residence she had worked to keep; anxiety from being treated and reported as delinquent even though she had paid and repeatedly proven her coverage; humiliation at being labeled a defaulting borrower and subjected to default and foreclosure demands; and disruption of her daily life.

113. This distress has persisted for months and continues because Defendant has not corrected its errors.

114.    The emotional distress has manifested in lost sleep, recurring stress and worry, diminished ability to concentrate on her work and family responsibilities, and the burden of devoting her time and attention to a dispute Defendant could have resolved.

115.    Her distress was caused or materially exacerbated by Defendant's post-NOE conduct, including its failure to issue a timely determination, its continued demands for amounts not owed after the response deadline, its refusal to correct the reported delinquency, and its repeated force-placement after acknowledging no lapse.

116.    Plaintiff mitigated her damages by repeatedly submitting proof of coverage, sending written notices, tendering the amount she believed was properly due, seeking an accurate accounting, and retaining counsel when Defendant did not correct the account.

117.    Each of these injuries is concrete and particularized, was caused by Defendant's conduct as alleged, and would be redressed by an award of damages.

118.    All conditions precedent to this action have been performed, have occurred, or have been waived.

### COUNT I - DEFENDANT'S VIOLATION OF RESPA
### AND REGULATION X, 12 U.S.C. § 2605(k)(1)(C), (E) AND 12 C.F.R. § 1024.35

119.    Plaintiff is a "borrower" under RESPA because she signed the mortgage and is liable under the Loan.

120.    The Loan is a "federally related mortgage loan" under 12 U.S.C. § 2602(1) and 12 C.F.R. § 1024.2(b), and is owned by Federal National Mortgage Association.

121.    Defendant is a "servicer" of the Loan under 12 U.S.C. § 2605(i)(2) and 12 C.F.R. § 1024.2(b) because it received and applied Plaintiff's mortgage payments.

122.     Each of NOE 1 through NOE 5 was a notice of error under 12 C.F.R. § 1024.35(a): it was in writing, was sent to Defendant's designated address, identified Plaintiff and her account, and identified the errors asserted.

123.     The errors Plaintiff identified are covered errors under Regulation X, including the imposition of force-placed flood insurance charges that Defendant lacked a reasonable basis to impose under 12 C.F.R. § 1024.35(b)(5), and Defendant's failure to cancel and refund those charges and to correct the resulting escrow and balance, which are servicing errors under 12 C.F.R. § 1024.35(b)(11).

124.     Regulation X required Defendant to acknowledge each notice within five business days under 12 C.F.R. § 1024.35(d), and within thirty business days either to correct the identified errors or, after conducting a reasonable investigation, to explain why it had determined that no error occurred, under 12 C.F.R. § 1024.35(e).

125.     Defendant could extend the thirty-day period only once, by fifteen business days, and only by notifying Plaintiff in writing of the extension and its reasons before the period expired.

126.     Defendant received NOE 1 on February 19, 2025.

127.     The thirty-business-day period to respond expired in early April 2025, and any properly noticed fifteen-business-day extension would have expired no later than late April 2025.

128.     Defendant never gave Plaintiff the written extension notices that 12 C.F.R. § 1024.35(e)(3)(ii) requires.

129.     It sent only requests for unspecified additional time, which do not extend the regulatory deadline.

130.   Defendant did not substantively respond to NOE 1 until August 5, 2025, more than five months after receipt and more than three months after the deadline expired.

131.   Defendant likewise failed to timely and substantively respond to NOE 2, NOE 3, NOE 4, and NOE 5.

132.   Defendant thereby violated 12 C.F.R. § 1024.35(e).

133.   When Defendant finally did respond to NOE 1, Regulation X permitted Defendant to determine that no error had occurred only after a reasonable investigation. See 12 C.F.R. § 1024.35(e)(1)(i)(B).

134.   A reasonable investigation required nothing more than a review of Defendant's own records, which contained the master-policy documentation Plaintiff previously submitted in November 2024.

135.   On information and belief, Defendant also had proof of the master policy from Plaintiff's previous servicer.

136.   Those records established that the building was continuously insured against flood and that no lapse had occurred.

137.   Defendant's determination was therefore not the product of a reasonable investigation.

138.   Defendant's August 5 representation that it had requested cancellation and a refund upon receipt of Plaintiff's proof was false.

139.   Defendant had received that proof months earlier and acted only after Plaintiff's repeated notices. That falsehood further shows that no reasonable investigation occurred.

140. Defendant further confirmed the inadequacy of its investigation by force-placing the identical flood coverage a second time, after it had already cancelled and refunded the first policy on the ground that the coverage was not needed.

141. After cancelling the first policy, it left the manufactured shortage, the inflated payment, the late charges, and the past-due reporting in place, and it repeated the violation through the second force-placement and its disregard of NOE 3 and NOE 4.

142. Defendant's failures across five successive notices of error, together with the conduct the Washington Department of Financial Institutions has charged, reflect a pattern or practice of noncompliance with RESPA and Regulation X.

143. The causal link between Defendant's violations and Plaintiff's damages is direct.

144. Timely compliance would have required Defendant to examine the same coverage and servicing records that later caused it to cancel the policy to inception and refund the premiums.

145. Had Defendant performed that review by the response deadline, Plaintiff would have received the correction months earlier.

146. That timely correction would have removed the force-placed charges from the escrow account and prevented those charges and their derivative accounting effects from being carried into later payment demands, late or default treatment, credit furnishing, and foreclosure-related charges.

147. Defendant's failure to update and maintain accurate insurance and servicing records also allowed the same unnecessary coverage to be placed again, producing additional charges that Defendant has not refunded and continues to try to collect from Plaintiff.

148.    Under 12 C.F.R. § 1024.35(i), Defendant could not, for 60 days after receiving Plaintiff's NOEs, furnish adverse information to any consumer reporting agency regarding any payment that was the subject of the notice of error.

149.    On information and belief, Defendant has continued reporting adverse credit information regarding payments made by Plaintiff that were the subject of the NOEs.

150.    As a direct and proximate result of Defendant's untimely and unreasonable responses, Plaintiff suffered the actual damages alleged above, including unrefunded second-policy charges, improper fees and account charges, costs of necessary later notices, credit harm, and emotional distress.

151.    Plaintiff is entitled to actual damages and, for Defendant's pattern or practice of noncompliance, statutory damages, together with costs and reasonable attorney's fees under 12 U.S.C. § 2605(f).

## COUNT II - DEFENDANT'S VIOLATION OF THE FLORIDA CONSUMER COLLECTION PRACTICES ACT, FLA. STAT. § 559.72(9)

152.    The debt secured by the Loan, including the escrow charges Defendant added to it, is a consumer debt under Fla. Stat. § 559.55 because it arises from a transaction primarily for personal, family, or household purposes.

153.    Defendant is a "person" subject to Fla. Stat. § 559.72, which applies to any person who collects or attempts to collect a consumer debt and is not limited to debt collectors.

154.    Section 559.72(9) prohibits any person, in collecting a consumer debt, from claiming, attempting, or threatening to enforce a debt when the person knows the debt is not legitimate, or from asserting the existence of some other legal right when the person knows that the right does not exist.

155. Defendant attempted to collect illegitimate debts and asserted nonexistent legal rights through monthly mortgage statements, improper charges, pre-suit default communications, and reinstatement demands sent directly to Plaintiff.

156. In these collection communications, Defendant demanded payment of amounts that included force-placed insurance charges, improper default-related fees and costs, including attorney's fees not yet incurred, and other amounts Plaintiff did not owe.

157. Under 42 U.S.C. § 4012a(e)(3), Defendant had 30 days from receipt of confirmation of the coverage to terminate the force-placed insurance and refund all premiums.

158. Plaintiff provided Defendant with proof of flood insurance coverage in November 2024.

159. Defendant failed to terminate the force-placed flood insurance and continued to charge and try to collect premiums from Plaintiff after the 30 days expired.

160. Defendant had no legal right to continue to charge and try to collect for the force-placed flood insurance after the 30 days expired.

161. Defendant knew it had no legal right because it received the policy information from Plaintiff in November 2024 and her NOEs thereafter.

162. NOE 1 informed Defendant in February 2025 that the building's master policy covered the Property and that force-placed flood insurance was not owed.

163. Not until August 6, 2025, did Defendant cancel the first force-placed flood policy and confirm in writing that there had been no lapse in coverage.

164. By cancelling the policy to its first day and returning every premium, Defendant determined and acknowledged that force-placed flood insurance on the Property had never been legitimately owed.

165. The Property's coverage did not change after August 2025; the master policy continued to insure the building.

166. Defendant therefore knew that force-placed flood insurance on the Property was not legitimately owed.

167. Independent of the first policy's cancellation, after Plaintiff again provided proof of current flood coverage in December 2025, Defendant had no basis to believe the Property lacked flood coverage for the second policy's period, and from that point Defendant knew that the second-policy charges were not legitimately owed.

168. With the knowledge its own cancellation had established, Defendant force-placed flood insurance a second time in late 2025 and, to date, has continued to charge Plaintiff for the premium.

169. Defendant included those known-illegitimate charges and demanded payment of them in mortgage statements and reinstatement communications, increasing the sum Plaintiff was told she had to pay to avoid losing her home.

170. Defendant has also charged and tried to collect illegal default- and foreclosure-related fees and costs.

171. Defendant thereby claimed, attempted, and threatened to enforce a debt that it knew was not legitimate.

172. As a direct and proximate result of Defendant's post-knowledge collection conduct, Plaintiff suffered concrete economic and non-economic harm.

173. Defendant's continued demands increased the amount owed under the Loan, including the second-policy charges assessed against her escrow account and a corresponding

increase in the amount Defendant treated as due, and generated derivative charges that would not otherwise have been incurred.

174. Plaintiff also lost money responding to the unlawful collection activity, including postage and delivery costs to dispute the charges.

175. Plaintiff further wasted substantial time reviewing Defendant's mortgage statements and reinstatement demands, identifying the illegitimate charges, drafting and sending disputes, and otherwise responding to collection efforts directed at a debt Defendant knew was not legitimately owed. She would not have had to expend that time absent Defendant's conduct.

176. Plaintiff also suffered the emotional distress alleged above, which Defendant's unlawful collection conduct caused and aggravated.

177. Defendant's repeated demands for amounts it knew were not legitimately owed, conveyed through collection communications that tied those charges to the threat of losing her home, caused Plaintiff fear, anxiety, and humiliation at being pursued as a defaulting borrower on a debt she did not owe.

178. That distress persisted throughout the period Defendant continued to bill and attempt to collect the known-illegitimate charges. It manifested in lost sleep, recurring worry, and diminished daily functioning, compounded by Defendant's repeated failures to correct the errors.

179. Plaintiff is entitled to actual damages, statutory damages of up to $1,000, punitive damages, declaratory and injunctive relief, and costs and reasonable attorney's fees under Fla. Stat. § 559.77(2).

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully asks this Court to enter judgment against Defendant for the following:

a.  Actual damages;

b.  Statutory damages;

c.  Punitive damages;

d.  Injunctive and declaratory relief;

e.  Attorney's fees and costs;

f.  Pre-judgment and post-judgment interest;

g.  An order immediately restraining Defendant, its agents, and anyone acting on its behalf from altering, deleting, or destroying any documents or records; and

h.  Such other relief as the Court deems just and proper.

Plaintiff respectfully demands trial by jury in this action.

Dated: July 2, 2026,                    Respectfully submitted,

/s/ Darren R. Newhart
Darren R. Newhart, Esq.
FL Bar No: 0115546
E-mail: darren@newhartlegal.com
NEWHART LEGAL, P.A.
14611 Southern Blvd, Suite 1351
Loxahatchee, FL 33470
Telephone: (561) 331-1806
Facsimile:  (561) 473-2946